## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

**BRIAN SHEREN**, as Personal         Case No.
Representative for the Estate of        Hon.
**ANITA SHEREN**, Deceased,

           Plaintiff,

v

**SUNBEAM PRODUCTS, INC.**,
d/b/a/ Jarden Consumer Solutions,
a Foreign Corporation,

           Defendant.

_____

Mark R. Dancer (P47614)
Ashley W. Wahl (P79331)
Dingeman & Dancer, PLC
Attorneys for Plaintiff
100 Park Street
Traverse City, MI  49684
(231) 929-0500
dancer@ddc-law.com

George E. McLaughlin, CO SBN 16364
McLaughlin Law Firm, P.C.
Co-Counsel for Plaintiff
1890 Gaylord Street
Denver, Colorado 80206-1211
720-420-9800
gem@w-mlawgroup.com

_____

# <u>COMPLAINT AND JURY DEMAND</u>

*There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in this complaint.*

NOW COMES Plaintiff BRIAN SHEREN, as Personal Representative of the

Estate of ANITA SHEREN, Deceased, by and through his attorneys, DINGEMAN &

DANCER, P.L.C., and for his Complaint against Defendant, respectfully represents unto

this Honorable Court as follows:

## Nature of Case

1.     This is a products liability and wrongful death action filed by Plaintiff Brian Sheren (Plaintiff) to recover damages on behalf of Anita Sheren's Estate against Sunbeam Products, Inc. due to a defective warming throw that caused a fire, which killed Anita Sheren.

## Parties, Venue, and Jurisdiction

2.     Plaintiff is the son of Anita Sheren, deceased, and the Personal Representative of her Estate. Plaintiff has standing to pursue this action under MCL 700.3703 and 700.3715.

3.     Defendant Sunbeam Products, Inc. is a Delaware corporation with its corporate headquarters and principal place of business located in Palm Beach County, Florida, at the street address of 2381 Executive Center Drive, Boca Raton, FL 33431, and as such is deemed to be a citizen of both the state of Delaware and the state of Florida.

4.     Defendant Sunbeam Products, Inc., is registered with the Michigan Department of Licensing and Regulatory Affairs to do business in the state of Michigan, and has designated as its registered agent in the state of Michigan CSC-Lawyers Incorporating Service, 601 Abbot Road, East Lansing, MI, 48823.

5.     Defendant Sunbeam Products, Inc., is registered with the Michigan Department of Licensing and Regulatory Affairs to do business in the state of Michigan under the assumed name of Jarden Consumer Solutions.

6.     At various times in the past that may be relevant hereto, Sunbeam Products, Inc. (Sunbeam) was previously known as, or was a predecessor in interest to,

2

or was a subsidiary of, or was a division of, or an affiliate of the following: Sunbeam Corporation; Sunbeam, Inc.; Sunbeam Oster Household Products, Inc.; Sunbeam-Oster Company, Inc.; Sunbeam Home Comfort Company; Sunbeam Oster Housewares; and/or Northern Electric Company.

7.      At all relevant times, Sunbeam did business in the state of Michigan, or had substantial contacts with the state of Michigan.

8.      Defendant Sunbeam, d/b/a Jarden Consumer Solutions, has distributors of its products located in Michigan, distributes its products in the state of Michigan, sells and advertises products on the Internet and through other media in the state of Michigan, has knowledge that its products will be distributed in the state of Michigan, has substantial and continuing contacts with the state of Michigan, expects that its products will be purchased by consumers in the state of Michigan, and committed the tortious acts alleged herein in the state of Michigan.

9.      Plaintiff is a resident of Grand Traverse County, Michigan, and is a citizen of the state of Michigan.

10.     Prior to her death, Anita Sheren was a resident of Grand Traverse County, Michigan, and was a citizen of the state of Michigan.

11.     The incident that forms the basis of this lawsuit occurred in Grand Traverse County, Michigan.

12.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 (a) because this action is between citizens of different states and the amount in controversy exceeds seventy-five thousand dollars ($75,000).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (a) and

(c).

## General Allegations

### The Sunbeam PTC Heating Element Electric Blanket

14. Plaintiff's decedent was the owner and the consumer of a certain style of Sunbeam electrically heated bedding product known within Sunbeam as a "Heated Throw", but hereinafter may at times be referred to as an "electric blanket", a "Sunbeam electric blanket", a "Heated Blanket", or the "Sunbeam product."

15. Upon information and belief, the Sunbeam Heated Throw of Plaintiff's decedent, Anita Sheren (Anita), was purchased for her in the state of Michigan in December 2017.

16. Plaintiff's decedent's Sunbeam Heated Throw product had a label on the fabric that bears the codes and numbers J088LTT071760151910C28D11, and upon information and belief was manufactured on or about the date of March 29, 2016.

17. The Sunbeam product owned and used by Plaintiff's decedent was known within Sunbeam as having what Sunbeam calls a positive temperature coefficient (PTC) heating element.

18. The Sunbeam product owned by Plaintiff's decedent was substantially similar in its electrical function and design to other Sunbeam electrically heated bedding products marketed, distributed, and sold by Sunbeam, known within Sunbeam as "Heated Throws", "Heated Blankets", and "Heated Mattress Pads".

19. Defendant Sunbeam designed, manufactured, marketed, distributed, and/or sold, and placed into the stream of commerce, the subject Sunbeam product, which was purchased for the use of Plaintiff's decedent in the State of Michigan.

20.     The PTC heating element used in the Plaintiff's decedent's Sunbeam product was designed and/or manufactured by Sunbeam for use in various styles, sizes, and designs of Sunbeam electrically heated bedding products, including Sunbeam heated blankets, throws, and mattress pads, hereinafter at times collectively called "electric blankets".

21.     The PTC heating element used in Sunbeam electric blankets is a propriety product of Sunbeam, that originally was protected by one or more U.S. Patents owned by Sunbeam.

22.     The basic design concept of the PTC heating element used in Sunbeam electric blankets was developed by Sunbeam prior to the year 1981.

23.     Since the original development, design, and manufacture of the Sunbeam PTC heating element for use in Sunbeam electric blankets, Sunbeam has known that in spite of careful manufacturing techniques, there will be occasions where an electrical fault develops in the PTC heating element, and that such a fault may result in a fire.

24.     In patent documents related to its PTC electric blanket products, Sunbeam has stated that, "Since the heating wire used in heating pads and electric blankets is typically made very thin and flexible and is subjected to repeated flexing from use, conductor breaks in the heating wire are common. When a conductor break occurs . . . [this] can cause a fire."

25.     Since the early stages of the development of this PTC electric blanket heating element technology, it was known to Sunbeam that PTC wire acted as a fuel once ignited.

26.    Since the early stages of the development of this electric blanket heating element technology, it was known to Sunbeam that under circumstances of foreseeable and expected use, or expected and foreseeable misuse, a break in one of the heating element conductors, or a fault or an open circuit, or a short circuit, could develop in the PTC wire, which, if energized, could cause electrical arcing, or overheating, and result in a fire.

27.    Since the early stages of the development of this PTC electric blanket heating element technology, it was known to Sunbeam that a number of manufacturing and assembly defects that could cause fires would inevitably be introduced into Sunbeam's electric blankets distributed for sale to the public, and thereby place users at risk for fires to occur in their homes and on their beds as they slept.

28.    Since the early stages of the development of this PTC electric blanket heating element technology, it was known to Sunbeam that under conditions of normal and reasonably expected use, and even some conditions of normal and reasonably expected misuse of this product, conditions could develop that would place users at risk of a fire occurring in the product.

29.    As a result of the above knowledge, from the early stages of development of this product line, Sunbeam, and in particular it's engineers, were aware of the need for a failsafe safety circuit that would effectively eliminate the risk of fires to users of this product, by de-energizing the product before a fire occurred, on the occasion of such events as described above.

30.    From approximately the year 1983 to through approximately April 30, 2000, Sunbeam used as a safety circuit in the vast majority of its PTC electric blankets

6

what is known within Sunbeam as the "triode-based sensing circuit", also known as "Circuit 100" to address some of these risks of fire.

31.     Sunbeam and its engineers knew that the triode-based sensing circuit, Circuit 100, was not failsafe, that it did not provide short circuit protection for the entirety of the PTC wiring within its electric blankets, and that it provided little or no open circuit or short circuit protection for the other electrical components and connections of the product.

32.     On September 20, 1983, Dr. William Rowe Jr., a Sunbeam engineer, warned Sunbeam in a confidential internal company memorandum that the triode-based safety circuit was not sufficiently reliable and that the company could expect to see five hundred (500) fires per year.

33.     In response to the warning issued by Dr. Rowe he was chided by his superior for making that projection in writing.

34.     After introduction of this product for sale to the public in the early 1980's, Sunbeam began to receive notices of fires caused by its PTC electric blankets in the form of warranty returns, consumer claims, consumer complaints, letters from consumers, lawsuits, and notices sent to Sunbeam from the United States Consumer Product Safety Commission (C.P.S.C.), which to date number in the thousands.

35.     These fire incidents that Sunbeam has received notice of range from pin-hole size burns, to catastrophic fires involving deaths, personal injury, or major property damage.

36.     The number of these fire incidents were and are far in excess of those projected by Dr. Rowe in 1983.

37.     From the time of its introduction of its electrically heated bedding products with the PTC heating element, to the present, Sunbeam has received notice of thousands of "near fires", such as incidents of sparking, smoking or smoldering, involving these Sunbeam PTC electric blankets, which had the potential to develop into a fire.

38.     After introduction of this product for sale to the public, Sunbeam began to receive notice of fires and "near fires" occurring during Sunbeam's in-house testing of these products during the manufacturing process.

39.     From the time of its introduction of its PTC electric blankets, to the present, Sunbeam has received notice of the existence of thousands of Plaintiff's decedent's Sunbeam product various manufacturing and assembly defects that had eluded its efforts at quality control, which were in its PTC heating element electric blankets sold to the public, and which were capable of causing fires.

40.     The number of these fire incidents confirmed the defects and dangers of Sunbeam's electrically heated bedding products with the PTC heating element; the inadequacies of its manufacturing, assembly, and quality control processes; the dangers of foreseeable and expected uses and misuses and the inadequacies of instructions and warnings to effectively avoid these fire risks; and, most importantly, the inadequacy and lack of sufficient effectiveness of the safety circuits Sunbeam had tried to develop to prevent these fires.

41.     In the late 1980's Dr. Rowe left Sunbeam's employment.

42.     Beginning in 1995, Dr. Rowe began writing critical reports and testifying as an expert witness in depositions and at civil trials against Sunbeam in electric blanket fire-related litigation, stating that Sunbeam's PTC heating element electric

blankets were unreliable, defective, and dangerous, and further describing the various design and manufacturing defects which caused these products to catch fire.

43.     On November 3, 1995, based in part on the testimony of Dr. Rowe, a jury in the United States District Court for the Eastern District of Oklahoma returned a verdict against Sunbeam in a case involving a PTC heating element electric blanket which had caused a fire which resulted in a wrongful death, and, based on theories of negligence and breach of warranty, the jury awarded both compensatory and punitive damages against Sunbeam.

44.     Due to the growing number of fire incidents including deaths and injuries reported to the United States Consumer Product Safety Commission (CPSC), and despite Sunbeam's concealment of, and failure to report, numerous other electrically heated bedding product fire incidents when it had a duty to do so under an active Section 15 CPSC investigation into this design of electrically heated bedding products, the CPSC in February 1997 requested ". . . that Sunbeam stop sale of old PTC technology blankets."

45.     Throughout 1997 and 1998, the CPSC urged Sunbeam to develop a safer design of electric blanket, continued to urge Sunbeam to stop sale of the "old PTC technology blankets," and further pressed Sunbeam to develop a corrective action plan or recall to remove previously sold PTC electric blankets from the marketplace.

46.     By December 1997, Sunbeam committed to a corrective action plan for the summer of 1998 to discontinue sale of these PTC technology electric blankets using the triode-based safety circuit.

47.     The commitment of Sunbeam stated in the paragraph immediately above, was made to forestall and avoid the CPSC from pursuing and imposing a

mandatory corrective action plan and recall.  The electric blanket product line was annually one of Sunbeam's most profitable, and generated one of the largest, if not the largest, amounts of cash flow for Sunbeam.

48.    In an effort to continue to manufacture, distribute, and sell electric blankets, in approximately 1997 Sunbeam developed a new design of safety circuit for use in its electric blankets, called within Sunbeam the "core-yarn" safety circuit or the "Model 602".

49.    Shortly after distribution for sale to the public of approximately 60,000 Model 602 electric blankets containing the "core-yarn" safety circuit, Sunbeam began receiving returns of those products because they had caught fire, or had arced or sparked in such a manner to present a fire hazard.

50.    Shortly after Sunbeam began to receive returns of Model 602 electric blankets which had caught fire, or presented a fire hazard, Sunbeam discontinued manufacturing the Model 602 electric blankets.

51.    In June of 1998 Sunbeam issued a public recall of all Model 602 electric blankets.

52.    According to a Sunbeam internal memorandum dated May 22, 1998 to a public relations firm, addressing the recall of the Model 602 electric blankets, "[W]e cannot create any kind of panic among owners and prospective purchasers of our millions of current technology blankets."

53.    In the press release that followed, dated June 19, 1998, announcing the recall of the Model 602 products, Sunbeam made the following intentional, knowing, or recklessly false and deceptive misrepresentations of material fact: There is no safety

problem with other Sunbeam electric blanket products. Are other Sunbeam electric blankets safe? Yes. All Sunbeam electric blankets are designed to shut off automatically if a problem develops with the wiring. . . . Other Sunbeam electric blanket products have a safety circuit with a different design which has been in use for many years and is safe.

54.    Sunbeam reneged on its commitment and agreement with the CPSC to recall the "old technology" PTC electric blankets.

55.    On January 29, 1999, a jury in the Superior Court of California, County of Sacramento, returned a verdict against Sunbeam in a Sunbeam PTC heating element electric blanket fire case based on theories of negligence, breach of warranty, and fraud for failure to warn and awarded compensatory damages of $1,199,225, and punitive damages in the amount of $5,000,000.

56.    On April 16, 1999, the safety of Sunbeam electric blankets was criticized in an exposé broadcast on the weekly news magazine known as ABC News 20/20.

57.    In anticipation of that broadcast, and later in response thereto, throughout 1999 Sunbeam communicated with its retailers, responded to the media, and placed on its public website the following statement that Sunbeam knew to be false, misleading, and deceptive at the time it was made, and which was intended to be relied upon by present and prospective retailers, purchasers, and users of its electric blankets: Sunbeam does not believe there has ever been a consumer injury from a Sunbeam electric blanket where the user has followed the blanket's use instructions.

58.    To this date Sunbeam has yet to advise or inform its retailers, or the public, that the statement quoted in the paragraph immediately above was inaccurate,

erroneous, false, misleading, or otherwise correcting this knowingly false, misleading, and deceptive statement.

59.     From November 1999, if not earlier, into the year 2001, if not later, Sunbeam's Internet website stated:  Are people injured because of electric blankets? Yes, if the instructions are not followed. That's true for any electric product or appliance. Sunbeam does not believe that there has ever been a consumer injury from a Sunbeam electric blanket where the user has followed the blanket use instructions.

60.     At the time defendant Sunbeam made the statement in its Internet website quoted in the paragraph above, Sunbeam was intentionally, knowingly, recklessly, and deceptively concealing the fact that it knew this statement to be false.

61.     To this date Sunbeam has yet to advise or inform its retailers, or the public, that the statement quoted in the paragraph above was inaccurate, erroneous, false, misleading, or otherwise correcting this knowingly false, misleading, and deceptive statement.

62.     To this date Sunbeam has yet to publish any statement to advise or inform its retailers, or the public, that the statement quoted paragraph above was inaccurate, erroneous, false, misleading, or otherwise correcting this knowingly false, misleading, and deceptive statement.

63.     From November 1999, if not earlier, into the year 2001, if not later, Sunbeam's Internet Web Site stated:  What causes incidents with electric blankets? Sunbeam believes that all incidents involving electric blankets are caused by smoking in bed or product misuse. . . .   Sunbeam does not believe that there has ever been a consumer injury from a Sunbeam electric blanket where the user has followed the blanket

use instructions.

64.     At the time defendants Sunbeam made the statement in its Internet Website quoted in the paragraph above, Sunbeam was intentionally, knowingly, recklessly, and deceptively concealing the fact that it knew this statement to be false.

65.     To this date Sunbeam has yet to advise or inform its retailers, or the public, that the statement quoted in the paragraph above was inaccurate, erroneous, false, misleading, or otherwise correcting this knowingly false, misleading, and deceptive statement.

66.     To this date Sunbeam has yet to publish any statement to advise or inform its retailers, or the public, that the statement quoted above was inaccurate, erroneous, false, misleading, or otherwise correcting this knowingly false, misleading, and deceptive statement.

67.     Sunbeam's 1999 website further stated: "Sunbeam electric blankets are engineered to exceed Underwriter's Laboratories standards for safety and UL is the most recognized and reliable standard setting agency," while knowingly and recklessly concealing that the UL standards then in effect did not reference PTC technology or safety circuits and that Sunbeam's electrically heated bedding products distributed since 1980's, and still being sold, would not meet the new UL standard published in 1999, that had been developed in conjunction with the CPSC, and that would take effect May 1, 2000.

68.     Sunbeam's actual knowledge concerning the safety of these PTC electric blankets was concealed and never revealed in any statements to the public, the media, retailers, Underwriters Laboratories (UL), or present or prospective purchasers of these products, nor was it anywhere mentioned in the warnings, instructions, or labeling

supplied to purchasers or users of this product.

69.     At the same time, and often in conjunction with the same above affirmative misrepresentations, Sunbeam knowingly concealed the mounting evidence of the dangers associated with the its electric blanket product line, including the fact that the CPSC had requested that Sunbeam stop selling it, the extensive claims history, including verdicts for punitive damages, and the outspoken criticisms by Sunbeam's former engineer, Dr. William Rowe, Jr.

70.     In early 2000, and no later than May 2000, Sunbeam introduced a new safety circuit in its electric blankets known within Sunbeam as "Circuit 104", which was intended to remedy many of the inadequacies inherent in the previous safety circuits.

71.     While apparently more effective than the previous safety circuits in detecting and reacting to some of the known and expected fire causing defects and conditions in Sunbeam PTC electric blankets, Circuit 104 is not failsafe in all circumstances, and does not detect and prevent all of the known fire causing defects and conditions that continue to exist in the manufacture and expected use of Sunbeam PTC electric blankets.

72.     Prior to distribution to the consuming public of any Sunbeam PTC electric blankets containing Circuit 104, Sunbeam knew that there were certain potential fire causing failure modes of the PTC heating element that the Circuit 104 did not detect or respond to.

73.     Subsequent to beginning distribution to the consuming public of the Sunbeam PTC electric blankets containing Circuit 104, Sunbeam began to see warranty returns, consumer complaints, and law suits where it appeared that fires were occurring

due to the inability of Circuit 104 to detect and react to all of the potential fire causing failure modes of the PTC heating element.

74.    Subsequent to beginning distribution to the consuming public of the Sunbeam PTC electric blankets containing Circuit 104, and Sunbeam's receipt of warranty returns, consumer complaints, and law suits where it appeared that fires were occurring due to the inability of Circuit 104 to detect and react to all of the potential fire causing failure modes of the PTC heating element, Sunbeam initially did nothing to investigate these failures, nor discover and correct the defects or deficiencies in design or manufacture that permitted these products to ignite.

75.    Eventually, Sunbeam did investigate some of these returned PTC electric blankets containing Circuit 104, where it appeared that fires were occurring due to the inability of Circuit 104 to detect and react to all of the potential fire causing failure modes of the PTC heating element, and discovered some of the defects in its design that permitted these fires to occur.

76.    After Sunbeam investigated some of these returned PTC electric blankets containing Circuit 104, where it appeared that fires were occurring due to the inability of Circuit 104 to detect and react to all of the potential fire causing failure modes of the PTC heating element, and discovered some of the defects in its design that permitted these fires to occur, it modified its design in the safety circuit to attempt to correct these deficiencies.

77.    However, after Sunbeam investigated some of these returned PTC electric blankets containing Circuit 104, where it appeared that fires were occurring due to the inability of Circuit 104 to detect and react to all of the potential fire causing failure

modes of the PTC heating element, and discovered some of the defects in its design that permitted these fires to occur, and modified its design in the safety circuit to attempt to correct these deficiencies, it did not:

    a. Recall any of the millions of products it had sold or distributed to date that contained these same defects or deficiencies in design;

    b. Notify the consuming public that it had sold millions of units of these products that contained these defects or deficiencies in design, which, under certain circumstances, may pose a fire hazard to the consumer;

    c. Notify the United States Consumer Product Safety Commission that it had sold millions of units of these products that contained these defects or deficiencies in design, which, under certain circumstances, may pose a fire hazard to the consumer; or,

    d. Notify UL that it had sold millions of units of these products that contained these defects or deficiencies in design, which, under certain circumstances, may pose a fire hazard to the consumer.

78. Furthermore, after Sunbeam investigated some of these returned PTC electric blankets containing Circuit 104, where it appeared that fires were occurring due to the inability of Circuit 104 to detect and react to all of the potential fire causing failure modes of the PTC heating element, and discovered some of the defects in its design that permitted these fires to occur, it was unable to determine why, in some instances, the safety circuit did not function as intended and designed, and continued to operate under conditions that may pose a fire hazard to the consumer.

79. After Sunbeam investigated some of these returned PTC electric blankets containing Circuit 104, where it appeared that fires were occurring due to the inability of Circuit 104 to detect and react to all of the potential fire causing failure modes

of the PTC heating element, and was unable to determine why, in some instances, the safety circuit did not function as intended and designed, and continued to operate under conditions that may pose a fire hazard to the consumer, it has continued to manufacture, distribute and sell to consumers millions of units per year of this same product.

80.    On March 17, 2009 Dennise Dunaway testified in a deposition given in a civil action styled *Harrington, et al. v. Sunbeam Products, Inc., et al.,* United States District Court for the Eastern District of Missouri, Cause No. 4:07CV1957 AGF, that her Sunbeam electrically heated blanket, which was known to be a PTC heating element product containing the Sunbeam Circuit 104, caught fire, and that there was no other known or apparent cause of ignition other than the product itself.  Ms. Dunaway was not a party to the *Harrington* civil action, and she had not sued Sunbeam as a result of the fire she experienced.

81.    On March 19, 2009 Jacob Yoches and Zachary Yoches each testified in depositions they each gave in a civil action styled *Harrington, et al. v. Sunbeam Products, Inc., et al.*, United States District Court for the Eastern District of Missouri, Cause No. 4:07CV1957 AGF, that their Sunbeam electrically heated blanket, which was known to be a PTC heating element product containing the Sunbeam Circuit 104, caught fire, and that there was no other known or apparent cause of ignition other than the product itself.  Neither Jacob Yoches nor Zachary Yoches was a party to the Harrington civil action, and neither of them had sued Sunbeam as a result of the fire they experienced.

82.    On April 2, 2009 Lisa Noltensmeier testified in a videotaped deposition given in a civil action styled *Harrington, et al. v. Sunbeam Products, Inc., et*

*al.,* United States District Court for the Eastern District of Missouri, Cause No. 4:07CV1957 AGF, that her Sunbeam Heated Throw, which was known to be a PTC heating element product containing the Sunbeam Circuit 104, caught fire, and that there was no other known or apparent cause of ignition other than the product itself.  Ms. Noltensmeier was not a party to the *Harrington* civil action, and she had not sued Sunbeam as a result of the fire she experienced.

83.     On April 7, 2009 Linda Wilmer testified in a deposition given in a civil action styled *Harrington, et al. v. Sunbeam Products, Inc., et al.,* United States District Court for the Eastern District of Missouri, Cause No. 4:07CV1957 AGF, that her Sunbeam electrically heated mattress cover, which was known to be a PTC heating element product containing the Sunbeam Circuit 104, caught fire, and that there was no other known or apparent cause of ignition other than the product itself.  Ms. Wilmer was not a party to the *Harrington* civil action, and she had not sued Sunbeam as a result of the fire she experienced.

84.     On June 24, 2010, a jury in a civil action styled *Barbara Kay and James Kay v Sunbeam Products, Inc.*, United States District Court for the Western District of Missouri, Case 2:09-cv-04065-NKL, returned a verdict finding Sunbeam liable for damages in a claim that a Sunbeam Heated Throw, with a PTC heating element and the Circuit 104, had caused of a fire that caused serious burn injuries to the plaintiff Barbara Kay.

85.     With all of the above knowledge, deposition testimony, adverse verdicts, and after investigation of returned PTC electric blankets containing Circuit 104 where it appeared that fires were occurring due to the inability of Circuit 104 to detect and

react to all of the potential fire causing failure modes of the PTC heating element, and discovering that in some instances the safety circuit does not function as intended and designed, and continues to operate under conditions that may pose a fire hazard to the consumer, Sunbeam has not:

      a.  Recalled any of the millions of products it had sold or distributed to date that contained these same defects or deficiencies in design;

      b.  Notified the consuming public that it has sold millions of units of these products that contain these defects or deficiencies in design, which, under certain circumstances, may pose a fire hazard to the consumer;

      c.  Notified the United States Consumer Product Safety Commission that it has sold millions of units of these products that contain these defects or deficiencies in design, which, under certain circumstances, may pose a fire hazard to the consumer; or,

      d.  Notified UL that it has sold millions of units of these products that contain these defects or deficiencies in design, which, under certain circumstances, may pose a fire hazard to the consumer. Sunbeam has been incapable of manufacturing PTC heating elements for use in its electric blankets that do not on occasion contain manufacturing defects that have the potential to, and in fact do, cause the product to catch fire.

86.    Sunbeam has been incapable of manufacturing PTC heating elements for use in its electric blankets that do not on occasion develop breaks in the conductors or other electrical faults that have the potential to, and in fact do, cause the product to catch fire.

87.    Sunbeam has been incapable of designing and manufacturing a safety circuit that will protect its electric blankets from catching fire as a result of all of the manufacturing defects and faults that are known to occur in its electric blankets containing the PTC heating element.

88.    In spite of its known inability to manufacture electric blankets with a safety circuit that will prevent fires in all circumstances known to Sunbeam to occur in the manufacturing of the product, Sunbeam fails to warn its retailers, of the hazard that this product may catch fire while being used in accord with its instructions, and without any misuse or abuse by the consumer.

89.    In spite of its known inability to manufacture electric blankets with a safety circuit that will prevent fires in all circumstances known to Sunbeam to occur in the manufacturing of the product, Sunbeam fails to warn its consumers of the hazard that this product may catch fire while being used in accord with its instructions, and without any misuse or abuse by the consumer.

90.    In spite of its known inability to manufacture electric blankets with a safety circuit that will prevent fires in all circumstances known to Sunbeam to occur in the manufacturing of the product, Sunbeam fails to inform the CPSC of the hazard that this product may catch fire while being used in accord with its instructions, and without any misuse or abuse by the consumer.

91.    In spite of its known inability to manufacture electric blankets with a safety circuit that will prevent fires in all circumstances known to Sunbeam to occur in the manufacturing of the product, Sunbeam fails to inform UL of the hazard that this product may catch fire while being used in accord with its instructions, and without any misuse or abuse by the consumer.

92.    Sunbeam continues to market and advertise its electrically heated bedding products, including its Heated Throws, for the purpose of providing heat to consumers.

93. Sunbeam further continues to advertise and market that its electrically heated bedding products, including its heated warming throws, are safe for consumers to use for prolonged periods of time.

94. On February 27, 2019, Anita was using the subject Sunbeam Heated Throw in her home, using it to stay warm while sitting on a couch.

95. On February 27, 2019, while Anita was using the subject Sunbeam Heated Throw in her home, it caught fire.

96. When Anita's Sunbeam Heated Throw caught fire, she was using it for its designed and intended purpose.

97. When Anita's Sunbeam Heated Throw caught fire, she was using it in compliance with its instructions for use.

98. When Anita's Sunbeam Heated Throw caught fire, she was using the Sunbeam Heated Throw in a manner that was or should have been reasonably expected or anticipated by a reasonable consumer.

99. After Anita's Sunbeam Heated Throw caught fire, she was unable to escape her home, suffered smoke inhalation, was severely burned, and suffered conscious pain and suffering, until she died in the fire.

## Count I – Negligence

100. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

101. The Sunbeam Heated Throw that was purchased for Anita was defectively designed, manufactured, constructed, assembled, tested, and inspected by Sunbeam, acting by and through its agents, servants, and employees.

102.    The Sunbeam Heated Throw was defective when it was placed into the stream of commerce.

103.    The Sunbeam Heated Throw was unreasonably dangerous to an extent beyond which would be contemplated by an ordinary consumer.

104.    Specifically, the Sunbeam Heated Throw was defective and unreasonably dangerous to foreseeable users, including Anita, for the following:

    a.  It was in a defective condition and unreasonably dangerous for its intended use at the time it left Sunbeam's control;

    b.  It was defective and unreasonably dangerous for its intended use in that, at the time it left Sunbeam's control, it deviated from design and manufacturing specifications or performance standards of the manufacturer, or from otherwise identical units manufactured to the same manufacturing specifications;

    c.  Its heating element and heating system design was unsafe;

    d.  It lacked adequate instructions for use and operation;

    e.  It lacked adequate labeling and warning of potential hazards and dangers of operation;

    f.  It lacked adequate safety devices, including those to automatically shut off the Heated Throw;

    g.  It was defective and unreasonably dangerous in design in that the known and foreseeable risks associated with the product's design exceeded the benefits, and the products was more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner;

    h.  It was defective and unreasonably dangerous due to lack of warning regarding foreseeable dangers inherent in the proper use, or foreseeable improper use, of the product;

    i.  It was defective and unreasonably dangerous because it

failed to perform as expected;

j.  The risks associated with the Sunbeam Heated Throw as designed, manufactured, and sold outweigh the benefits of the Sunbeam Heated Throw as designed, manufactured and sold; and,

k.  It was not "state of the art" as practical and technically feasible alternative safer designs were available that would have presented the harm or substantially reduced the risk of such harm without substantially impairing the usefulness, utility, practicality, or desirability of the product.

105.   In designing its Heated Throw, Sunbeam was negligent in one or more of the following respects:

a.  Failing to use due care in designing, manufacturing, and distributing the Sunbeam Heated Throw, which was unreasonably dangerous for normal, intended, and foreseeable uses;

b.  Failing to adequately test and/or inspect the Sunbeam Heated Throw;

c.  Failing to provide adequate warnings and instructions about the risk of the Sunbeam Heated Throw;

d.  Failing to design and incorporate adequate safety technology to eliminate or reduce the risk of malfunction and fire caused by foreseeable manufacturing and/or design defects in the Sunbeam Heated Throw;

e.  Failing to provide for a power cut-off under all reasonably foreseeable circumstances of a malfunction, which had the potential to cause fires;

f.  Failing to provide for a system to ensure that the safety circuitry remained operable and functional whenever the Heated Throw was turned on;

g.  Continuing to sell its Heated Throws to the public despite knowledge and notice of substantial fire risks; and,

h.  Willfully disregarding a known defect in its Heated Throws.

106.   The injuries and damages sustained by Anita and her Estate were caused by the defective condition of the Sunbeam Heated Throw, which Sunbeam willfully disregarded and was unreasonably dangerous to users and consumers in general, and to Anita in particular, which defective condition existed at the time Sunbeam parted with possession thereof, thereby imposing liability on Sunbeam because:

a. The Sunbeam Heated Throw malfunctioned during a reasonably foreseeable use in that it caused a fire resulting in death;

b. The Sunbeam Heated Throw lacked necessary safety devices to make it reasonably safe for its intended uses, in that the safety devices, as they were, did not prevent the Sunbeam Heated Throw from causing a fire;

c. The Sunbeam Heated Throw was defective in that it caused a fire;

d. The materials in the Sunbeam Heated Throw's electrical system were subject to failure during normal use;

e. The Sunbeam Heated Throw lacked adequate warnings of hazards; and

f. A defect or structural failure resulted in the blanker starting a fire.

107.   At the time of Anita's death, the Sunbeam Heated Throw was in the same or substantially the same condition as it was when it was manufactured, imported, and distributed by Sunbeam, and had not been changed, altered, or damaged in any material way by Anita Sheren.

108.   Anita used the Sunbeam Heated Throw in a reasonably foreseeable way and/or in a way that Sunbeam should have reasonably expected it to be used by consumers.

109.   Thus, as a direct and proximate result of Sunbeam's negligence, Plaintiff and Plaintiff's decedent's Estate were damaged in, but not limited to, the following particulars:

a.  the wrongful death of Anita Sheren, depriving her of the opportunity to enjoy the later years of her life with her family and friends;

b.  conscious pain and suffering undergone by Anita Sheren, during the period intervening between the onset of the fire and her death;

c.  loss of Anita Sheren's life; and

d.  other damages, injuries and consequences that are found to be related to the motor-vehicle accident, to the extent that such damages are recoverable under Michigan Law.

110.   As a direct and proximate result of Sunbeam's negligence, Plaintiff and Plaintiff's decedent's Estate suffered serious damage and injury, including, but not limited to, the following:

a.  medical, funeral, and burial expenses;

b.  loss of Anita Sheren's services;

c.  loss of Anita Sheren's society and companionship;

d.  pain and suffering; and,

e.  all injuries and damages that are fair and just and that bear on the circumstances of this loss.

**WHEREFORE**, Plaintiff, as Personal Representative of the Estate of Anita Sheren, deceased, asks the Court to award him damages against Defendant in whatever amount Plaintiff is found to be entitled to in excess of $75,000.00, plus interest, costs, attorney fees, and any other amount that is equitable.

## Count II – Breach of Implied Warranty

111.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

112.   At all times relevant hereto, Sunbeam was a merchant regularly engaged in distributing Sunbeam Heated Throws, which were expressly and impliedly warranted by Sunbeam to be merchantable and fit for the ordinary purpose for which they were intended to be used.

113.   At all times pertinent to this Complaint, Sunbeam advertised said Heated Throw and related products, and made statements of representation about the abilities, performance, safety, and dependability of said products that there products were safe and dependable, which warranties became part of the basis of the bargain and were relied upon by purchasers and users of its blankets, including Anita Sheren.

114.   Sunbeam impliedly warranted that the Heated Throw was fit for the purpose for which it was sold and made other implied warranties as to its condition and suitability for use.

115.   Sunbeam breached these warranties by designing, manufacturing, and/or selling the Heated Throw in a dangerous, defective, and unreliable condition.

116.   As a direct and proximate cause of the defective and unreasonably dangerous condition of the Sunbeam Heated Throw, Plaintiff and Plaintiff's decedent's Estate suffered the wrongful death of Anita, as more fully described above.

**WHEREFORE**, Plaintiff, as Personal Representative of the Estate of Anita Sheren, deceased, asks the Court to award him damages against Defendant in whatever

amount Plaintiff is found to be entitled to in excess of $75,000.00, plus interest, costs, attorney fees, and any other amount that is equitable.

<u>**Count III – Gross Negligence and Willful Conduct**</u>

117.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

118.    Sunbeam's conduct was far more egregious than mere negligence as it knew and/or should have known of the fire risks associated with its Heated Throws.

119.    Despite Sunbeam's knowledge of the fire risks associated with its Heated Throws, sunbeam:

   a.  Failed to recall and/or discontinue selling its Heated Throws;

   b.  Failed to provide post-sale warnings to purchasers regarding the fire risks associated with its Heated Throws; and,

   c.  Failed to retrofit its Heated Throws with adequate safety devises to prevent fires, such as the one that killed Anita.

120.    Sunbeam's actions and inactions were willful and wanton and demonstrate a reckless disregard for Anita Sheren's life, health, and safety.

121.    As a direct and proximate result of Sunbeam's gross negligence, Plaintiff and Plaintiff's decedent's Estate suffered the wrongful death of Anita Sheren, as more fully described above.

**WHEREFORE**, Plaintiff, as Personal Representative of the Estate of Anita Sheren, deceased, asks the Court to award him damages against Defendant in whatever amount Plaintiff is found to be entitled to in excess of $75,000.00, plus interest, costs,

attorney fees, and any other amount that is equitable.

DINGEMAN & DANCER, PLC

Date:  January 30, 2020            By:    /s/Ashley W. Wahl_____
                                          Mark R. Dancer (P47614)
                                          Ashley W. Wahl (P79331)
                                          Attorneys for Plaintiff
                                          100 Park Street
                                          Traverse City, MI 49684
                                          (231) 929-0500

## JURY DEMAND

Plaintiff demands a jury trial in the above-captioned matter.

DINGEMAN & DANCER, PLC

Date:  January 30, 2020            By:    /s/Ashley W. Wahl_____
                                          Mark R. Dancer (P47614)
                                          Ashley W. Wahl (P79331)
                                          Attorneys for Plaintiff
                                          100 Park Street
                                          Traverse City, MI 49684
                                          (231) 929-0500